**BATH PETROLEUM STORAGE, INC., Plaintiff,**

v.

**MARKET HUB PARTNERS, L.P., Market Hub Partners, Inc., TPC Corporation, and Coalition for Resources and Environment in the Southern Tier, Inc., Defendants.**

**No. 98–CV–6138 CJS.**

United States District Court,
W.D. New York.

Feb. 25, 2000.

Ronald H. Sinzheimer,Albany NY, Jerry William Boykin, W. Michael Holm, The Jefferson Law Firm PLC, McLean, VA, for Plaintiff.

John B. Wyss, Wiley, Rein & Feilding, Washington, DC, John R. Simon, Rochester, NY, Robert J. Alessi, Mark W. Dykes, David M. Conneors, Joseph M.R. Covey, LeBoeuf, Lamb, Greene & MacRae, Albany, NY, Alan K. Knauf, Knauf Koegel & Shaw LLP, Rochester, NY, for Defendants.

## DECISION and ORDER

SIRAGUSA, District Judge.

### INTRODUCTION

This is an action in which plaintiff, Bath Petroleum Storage, Inc. ("BPSI"), a company which was attempting to create an underground natural gas storage facility, claims that its business was unlawfully damaged by a competitor. Essentially, plaintiff alleges that defendants made fraudulent statements to several administrative agencies which were regulating plaintiff, and that as a result, plaintiff's attempt to create the gas storage facility failed. Plaintiff contends that defendants conspired to violate and did in fact violate *Civil Rico* 18 U.S.C. § 1961 *et seq.*, that they violated Section 349 of New York's General Business Law, that they tortiously interfered with plaintiff's contractual relationships, and that they perpetrated common law fraud. In addition, plaintiff alleges that defendants Market Hub Partners and TPC violated the anti-trust laws of the United States and the State of New York, including § 2 of the Sherman Act, 15 U.S.C. § 2 and § 340 of New York General Business Law. Now before the Court are three separate motions to dismiss [# 13][# 19][# 26] filed by defendants, pursuant to Federal Rules of Civil Procedure 9 and 12. For the reasons that follow, those motions to dismiss are granted.

### BACKGROUND

■ The facts as set forth below are taken from the complaint and various documents submitted by defendants in support of their motions. On a motion to dismiss pursuant to Rule 12(b)(6), the Court's "consideration is limited to the fac-

tual allegations in plaintiff['s] ... complaint, which are accepted as true, to documents attached to the complaint as an exhibit or incorporated in it by reference, to matters of which judicial notice may be taken, or to documents either in plaintiffs' possession or of which plaintiffs had knowledge and relied on in bringing suit." *Brass v. American Film Technologies, Inc.*, 987 F.2d 142, 150 (2d Cir.1993)(citing *Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 47–48 (2d Cir.1991), *cert. denied,* 503 U.S. 960, 112 S.Ct. 1561, 118 L.Ed.2d 208 (1992)). The Court may also consider facts stated in plaintiff's RICO case statement. *McLaughlin v. Anderson,* 962 F.2d 187, 189 (2d Cir.1992). However, "[i]f a district court wishes to consider additional material, Rule 12(b) requires it to treat the motion as one for summary judgment under Rule 56, giving the party opposing the motion notice and an opportunity to conduct necessary discovery and to submit pertinent material." *Kramer v. Time Warner, Inc.,* 937 F.2d 767, 773 (2d Cir.1991). In support of their motions to dismiss, defendants have submitted various documents related to the administrative actions before the FERC, DEC, and EPA, upon which plaintiff's action is based. These include the documents which plaintiff and defendants filed with the various agencies, certain correspondence between them and the agencies, and the decisions of these agencies. Plaintiff, which was a party to these administrative proceedings, does not deny that it had notice of these documents. Although these documents were not attached to plaintiff's complaint, the Court finds that these are documents of which plaintiff had notice, and upon which plaintiff relied in bringing this action. Accordingly, the Court finds that it may properly consider these documents on a motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(6), pursuant to *Cortec Industries, Inc. v. Sum Holding L.P.,* 949 F.2d 42, 47–8 (2d Cir. 1991), *cert. denied,* 503 U.S. 960, 112 S.Ct. 1561, 118 L.Ed.2d 208 (1992)(Noting that "[w]here plaintiff has actual notice of all the information in the movant's papers and has relied upon these documents in framing the complaint the necessity of translating a Rule 12(b)(6) motion into one under Rule 56 is largely dissipated."); *see also, Novo Nordisk of North America, Inc. v. Genentech, Inc.,* 885 F.Supp. 522, 526 (S.D.N.Y.1995)(holding that pursuant to *Cortec,* on a motion to dismiss pursuant to Rule 12(b)(6), court may consider findings of administrative law judge in a related administrative proceeding, where plaintiff had notice of exhibit, and exhibit was integral to plaintiff's claim); *Envirosource, Inc. v. Horsehead Resource Dev. Co., Inc.,* No. 95 CIV. 5106(AGS) 1996 WL 363091 at *5 (S.D.N.Y. July 1, 1996). In the *Cortec* decision, the Second Circuit stated, in relevant part:

> [W]e have held that when a plaintiff chooses not to attach to the complaint or incorporate by reference [documents] upon which it solely relies and which [are] integral to the complaint, the defendant may produce [the documents] when attacking the complaint for its failure to state a claim, because plaintiff should not so easily be allowed to escape the consequences of his own failure.

*Cortec Industries Inc. v. Sum Holding, L.P.,* 949 F.2d at 47. Thus, a plaintiff should not be permitted to survive a motion to dismiss and put a defendant to the trouble and expense of discovery simply by excluding highly relevant facts and documents from its complaint.

Since 1983, plaintiff has operated a natural gas storage business in Bath, New York, at a facility which has been in existence since the early 1950's. Plaintiff stores natural gas in underground salt caverns, which are created by drilling holes through the surface of the earth, through bedrock and other geological formations, until the salt layer is reached. Plaintiff next pumps fresh water into the salt layer, thereby dissolving the salt and creating a cavern. Plaintiff then pumps the saltwater brine out of the caverns, and stores it in brine ponds on its land. Finally, plain-

tiff disposes of some of this brine by discharging regulated amounts of the brine into the Cohocton River, which is adjacent to the facility. At all times relevant to the lawsuit, defendants, through one of their subsidiaries, N.E. Hub Partners, were creating their own salt-cavern natural gas storage facility in Tioga, Pennsylvania. Defendant TPC Corporation (TPC) is the United State's largest owner of natural gas salt cavern storage facilities, and plaintiff claims that TPC essentially owns and controls defendants Market Hub Partners, L.P., and Market Hub Partners, Inc. ("MHP")[1].

In 1995, MHP sought to purchase plaintiff's natural gas storage facility, however, the parties never reached agreement. Instead, in 1996, plaintiff entered into a lease agreement with another company known as · CNG Transmission Corporation (CNGT), an inter-state natural gas pipeline company providing natural gas transportation and storage service principally in the northeastern and mid-Atlantic regions of the United States. Pursuant to this agreement, plaintiff agreed to provide CNGT with natural gas storage capacity from plaintiff's existing caverns by late 1997 and from new caverns under construction in 1999.

### a. The Proceeding before FERC

As part of the agreement between plaintiff and CNGT, plaintiff needed to convert a portion of its facility previously used to store liquid propane gas into a storage facility for natural gas, a move which required the approval of the Federal Energy Regulatory Commission (FERC). CNGT was required, under the lease, to obtain a Certificate of Public Convenience and Necessity from FERC. On May 6, 1996, CNGT filed an application requesting such approval from FERC. On July 10, 1996,

the New York Department of Environmental Conservation (DEC) sent a letter to FERC, noting that it had "several technical and environmental concerns on the feasibility of [CNGT's] proposed project." (Declaration of John P. Quinn [# 16], Exhibit 3) The DEC stated that since CNGT's application had not addressed the feasibility of storing natural gas in underground caverns at the Bath site, FERC should conduct "a comprehensive technical review" of the proposed project, and DEC listed a number of specific areas for FERC to review. (Id.) The DEC stated that "at a bare minimum," FERC should evaluate eleven specific concerns, including whether there were any geological faults at the project site. The DEC also described a number of environmental concerns, including the fact that solution mining would likely increase the amount of saltwater brine that plaintiff would want to discharge into the Cohocton River. Accordingly, the DEC indicated that it would require plaintiff to obtain a new State Pollution Discharge Elimination System (SPDES) permit to regulate plaintiff's discharge of saltwater brine. (Id.)

On August 15, 1996, in response to a public notice filed by FERC, MHP filed with FERC a 46–page motion to intervene in CNGT's proceeding and for a cease and desist order against plaintiff.[2] ([# 40], Exhibit A). The motion alleged that plaintiff was at that time already engaged in construction, drilling, solution mining and site preparation of natural gas storage caverns without the necessary approval from FERC. Most of that motion, 33 pages of it, was legal argument explaining why plaintiff and its mining activities should be subject to FERC's jurisdiction. A portion of MHP's motion also described potential problems with using the Bath site as a natural gas storage facility. It described

---

1. The Court uses the abbreviation "MHP" herein to refer to both Market Hub Partners, L.P. and Market Hub Partners, Inc.

2. Arlington Storage Corporation, Public Service Electric and Gas Company, Long Island Lighting Company, New York State Electric & Gas Corporation and Chattanooga Gas Company also intervened in the FERC proceeding. (Declaration of Drew J. Fossum, [# 15]).

past problems that plaintiff had reported, including a tubing failure and fire which had occurred in number 2 and 2a wells. MHP asked FERC to issue a cease and desist order against BPSI's allegedly unauthorized mining activities. On August 28, 1996, MHP filed another motion in opposition to CNGT's application with FERC. That motion was 31 pages long and dealt exclusively with rates that CNGT had proposed to charge its customers if FERC approved its application. (Declaration of Drew J. Fossum [# 15], Exhibit B). On September 10, 1996, FERC issued a determination that plaintiff was subject to FERC's jurisdiction, and that plaintiff could not develop its salt caverns for gas storage any further without obtaining FERC approval. (Declaration of John P. Quinn [# 16], Exhibit 5). On October 23, 1996, FERC informed CNGT that since it had not received an application from either CNGT or BPSI for permission to develop the salt caverns, that it considered CNGT's application incomplete, and that it would not be able to process CNGT's application in a timely fashion. (Id., Exhibit 6). Some time thereafter, CNGT amended its application, and on December 26, 1996, MHP filed with FERC a protest to CNGT's amended application. (Attachment to MHP Memorandum [# 40], Exhibit B). In its protest, MHP alleged that it had discovered evidence of a geological fault at plaintiff's site. It also raised environmental concerns relating to plaintiff's disposal of the saltwater brine solution. However, at least half of the protest dealt only with issues relating to the project's proposed cost and rates to be charged by CNGT. On October 10, 1997, FERC requested additional information from CNGT. (Declaration of John P. Quinn [# 16], Exhibit 11). On January 28, 1998, FERC informed CNGT that it was dismissing its application without prejudice, because of CNGT's failure to provide requested information. (Id. Exhibit 12).

Plaintiff's complaint alleges that MHP's filings with FERC were fraudulent. The complaint states, in relevant part, that "[t]he primary thrust of these objections was focused on the geological conditions present at the Bath Storage Facility and its appropriateness for the storage of natural gas. MHP also alleged that the BPSI facility was unsafe and constituted an environmental hazard." [3] (Complaint [# 1], ¶ 72). Plaintiff contends that MHP made the following statements to FERC:

a. A geological fault exists at the Bath Storage Facility. . . .; b. BPSI's cavern design and construction practices deviate materially from established guidelines promulgated by an subcommittee of the The Interstate Oil and Gas Compact Commission ("IOGC"). . . .; c. There is evidence of structural failures at the BPSI site; d. The existing caverns at the BPSI site are structurally and mechanically unstable for high pressure natural gas storage and, given the potential for migration and release of explosive product from the wells across and possibly off site including the Cohocton River, the potential for devastating environmental impacts is high; e. there is a potential for full scale collapse of the underground salt cavern storage facilities which would jeopardize the health and safety of area residents; f. BPSI has a history of releasing high concentration of chlorides into the Cohocton River in violation of its . . . [SPDES] permit which resulted in crop damage in downstream areas and will continue to result in significant potential for the degradation of downstream aquatic environments; and g. BPSI cannot maintain pressure at levels required to use the caverns for the storage of natural gas.

(Id.). Plaintiff contends that these statements were false because, in fact, there

---

**3.** The Court notes that it has thoroughly reviewed MHP's objections, and while this was one of the issues raised by MHP, the Court does not agree that it was the "primary thrust" of MHP's objections.

was no geologic fault, its cavern design was superior to MHP's Tioga cavern, there was no evidence of structural failures, that based on testing, there was "very little possibility" of a catastrophe, it had fully complied with its SPDES permit, and tests showed that its caverns could withstand pressure so as to allow storage of natural gas. (Id.¶ 73). In response to MHP's filings, CNGT notified FERC that it believed MHP's allegations regarding the safety and feasibility of the project were false. (See, "Motion for Leave to Answer and Answer of CNG Transmission Corporation to the Protest of Market Hub Partners, L.P.", Declaration of John P. Quinn [# 16], Exhibit 18).

The Court notes that the complaint does not specifically allege that FERC was misled or defrauded by MHP's allegations. Rather, it states only that MHP's filing caused CNGT to amend its application:

> MHP's effort was met with initial success when CNGT filed on April 18, 1997, an amendment to its year-old application for the Seasonal Service Expansion Project, and sought phased consideration of the project out of concern that all of the authorizations requested would not be granted in time for the 1997–1998 winter heating season. Under the amendment consideration of the BPSI proposal was to be deferred. Thus, it was clear that MHP and the other Defendants had been successful in delaying consideration by FERC of the use by CNGT of the Bath Storage Facility for the storage of natural gas.

(Complaint [# 1], ¶ 85). However, plaintiff claims that MHP's actions ultimately caused CNGT to breach its lease with plaintiff. The complaint states that in Jan-

uary of 1998, CNGT informed plaintiff that "as a direct result of MHP's and CREST's[4] actions to thwart regulatory approval, it had determined to terminate the Lease Agreement with BPSI, which was finally accomplished in January 1998." Plaintiff admits, however, that on January 28, 1998, FERC dismissed CNGT's application, without prejudice, because of "serious data deficiencies" with CNGT's application, and because of CNGT's failure to respond to "FERC inquiries." (Complaint [# 1], ¶ 87; Declaration of John P. Quinn [# 16], Exhibit 12)

### b. The Proceeding Before New York's DEC

At the same time that the aforementioned proceedings were taking place before FERC, in November of 1996, the New York State DEC proposed to modify plaintiff's existing SPDES permit.[5] The proposed modification used the "mass balance" formula, a different formula than was previously used in calculating concentration levels of chlorides and other wastes that plaintiff was discharging into the Cohocton River, which restricted plaintiff's ability to discharge salt-water brine into the river. Plaintiff alleges that the "mass balance" formula had never before been utilized by the New York DEC to measure compliance with water pollution standards, and that the formula made it virtually impossible for BPSI to discharge salt brine into the Cohocton River without subjecting itself to enforcement actions by the DEC for violation of the permit. Plaintiff alleges, upon information and belief, that this modification of its permit came about because MHP "induced" the DEC to make the modification. (Complaint, ¶ 91) The complaint does not specifically say that MHP

---

4. Although the complaint alleges that defendant Coalition For Resources and Environment in the Southern Tier, Inc. (CREST) intervened in the FERC proceeding, it does not identify any statements that CREST allegedly made to FERC, none of the documents from the FERC proceeding refer to CREST, and CREST denies that it intervened in that action.

5. As noted above, in its July 10, 1996 letter to FERC, the DEC stated that as a result of the proposed change in plaintiff's operations, it would required plaintiff to obtain a new SPDES permit.

defrauded the DEC, or that MHP made misstatements to the DEC, thus it is unclear how MHP allegedly "induced" the DEC to do this. The complaint also states that MHP urged DEC to use the "mass balance" formula for plaintiff's permit, but it does not allege that MHP in any way defrauded DEC into doing this. (See, Complaint, ¶ 109). In any event, plaintiff objected to the modification of its permit, causing DEC to conduct a modification proceeding. In February of 1997, two weeks after it was formed, a non-profit corporation named Coalition For Resources and Environment in the Southern Tier, Inc. ("CREST") filed a petition to intervene in plaintiff's modification proceeding before the DEC. Plaintiff contends that CREST was and is a sham corporation created by MHP and TPC, for the purpose of intervening in the modification proceeding, since "[i]t is unlikely that MHP, as a competitor, would have been granted party status in the administrative proceeding." (Complaint [# 1], ¶ 98). The complaint alleges that CREST made the following statements to the DEC:

a. BPSI was guilty of having violated the terms of its existing SPDES permit by discharging huge quantities of brine into the Cohocton River; b. These discharges have caused a significant negative impact on the fish population downstream in the Cohocton River; c. The BPSI proposal would likely result in harm to the habitat of the timber rattlesnake, an endangered species; d. As a consequence, a more thorough environmental impact study should be required; e. The planned conversion to natural gas would create an increased threat of catastrophic explosion; f. As a result of years of uncontrolled solutioning, BPSI's storage cavern facility has become dangerously unstable . . . . . g. The environmentally unsafe use of the caverns could result in the release of explosive product into the prolific fresh water aquifers of the Cohocton River underlying the facility; Subsurface subsidence could result in full scale collapse of the underground

salt cavern storage facilities resulting in uncontrolled release of the gas product; i. Substantial geological faulting exists on the site creating an environmental hazard; During the period of 1994 to 1996, BPSI substantially exceeded the level of effluents permitted in its discharge into the Cohocton River under its SPDES permit. This has resulted in poor plant growth downstream; and k. The design of the underground injection wells for brine disposal is scientifically flawed given the volume of brine which would be required to be discharged each day.

(Complaint, par. 93). Plaintiff states that these statements were "fraudulent, false, and misleading," because:

a. BPSI explicitly followed the effluent limitations and monitoring requirements set forth in its SPDES permit . . . . .; b. CREST has provided no evidence of any damage to fish in the Cohocton River. Rather, studies commissioned by BPSI prove that there has been no damage and, in fact, the only deterioration in river quality has been the result of other point sources; c. studies and surveys have yet to reveal the existence of the timber rattlesnake at the property in question; d. Adequate and complete environmental studies were conducted and there is no rational basis for requiring additional tests or studies; e. The planned conversion to natural gas would not in any manner create an increased threat of catastrophic explosion and in fact, natural gas is safer to handle than LPG . . . .; f. There is no evidence of uncontrolled solutioning of caverns which would permit the migration of gases. In fact, all studies demonstrate the continued integrity of the individual caverns which have not expanded to any significant degree in the entire time the facility has been utilized . . . .; g. There is no rational basis for contending that BPSI caverns pose any danger to fresh water aquifers which are located approximately one-half mile above the storage

caverns. Moreover, LPG and natural gas are not even considered potential pollutants to water by the EPA and [is] not included on its list of pollutants; h. Testing unequivocally demonstrates that significant surface subsidence at this location is a practical impossibility; i. There is no evidence of geological faulting . . . . ; j. BPSI has fully complied with the sampling and monitoring requirements of its SPDES permit and damage to plant life, if any, cannot be shown to be a result of BPSI's discharges into the Cohocton River; k. Tests show that the successful use of an underground injection well is feasible at this location. Even were it not, the only risks involved with the use of such a well are economic not environmental.

(Complaint, par. 94). Plaintiff claims that the affidavits and studies submitted by CREST were actually prepared by MHP's engineering firm. In March of 1997, CREST was allowed to intervene in the modification proceeding. Plaintiff claims that at the administrative hearing, CREST had employees of MHP's engineering firm testify falsely concerning the risk of environmental damage from BPSI's gas storage facility. For example, plaintiff contends that one of the employees testified that the brine produced could contain oil and grease, when in fact that is not true. At the hearing, these employees of MHP's engineering firm admitted that they had done substantial work on MHP's Tioga project.

Plaintiff does not specifically state that DEC was defrauded by anything that CREST did. Rather, the complaint states only that "NYDEC staff had relied on the factual representations made by CREST and embarked on a proceeding that threatens BPSI's existing LPG storage business." (Complaint ¶ 101). The complaint further states that "NYDEC has relied on the false, fraudulent and misleading statements and representations of MHP and as a result final action on [plaintiff's] permit has been delayed" (Complaint ¶ 104), how-

ever the complaint does not identify any particular action that the DEC allegedly took as a result of the actions of MHP or CREST. The complaint does not specifically allege that MHP defrauded the DEC, although it does allege that there was an improper working relationship between MHP and DEC, such that the DEC became a willing tool for MHP to use against plaintiff. The complaint states that "MHP has directly provided NYDEC information and various inappropriate methodologies which NYDEC has accepted and utilized to substantially impede the permitting process," and that the DEC "was participating actively as part of the Enterprise seeking to destroy BPSI's business." (Complaint ¶ 105,106) Moreover, the complaint alleges that the DEC intentionally withheld internal documents regarding plaintiff's permit from plaintiff, while providing the same documents to CREST. (Complaint ¶ 107). In short, plaintiff claims that the DEC conspired with defendants to harm plaintiff.

On February 25, 1997, as part of the SPDES permit modification proceeding, DEC Administrative Law Judge Helene Goldgerger issued an "ALJ Ruling on Issues and Party Status." ( [# 19], Exhibit A) In that decision, the ALJ rejected plaintiff's claim that MHP had "induced" the DEC to modify plaintiff's SPDES permit. In her decision, the ALJ acknowledged that DEC had received a complaint about plaintiff from an unidentified competitor, however, she also noted that prior to that, the DEC became concerned that plaintiff was exceeding its SPDES permit when it learned that plaintiff had applied to the Susquehanna River Basin Commission for permission to pump ground water for use in solutioning. The ALJ also considered and rejected plaintiff's contentions that CREST was a sham corporation, since CREST's petition "included information on members of the organization who live in Bath, on or near the Cohocton River and enjoy and use its resources," and that "at the legislative hearing, a number of individuals presented written statements, gave

oral testimony and signed registration cards acknowledging their interest in these proceedings and their affiliation with CREST." The ALJ ruled that CREST would be allowed to participate in the proceeding with regard to issues relating to the SPDES permit only, and that the other issues CREST had raised were more properly raised in other proceedings pending before the DEC and FERC. The ALJ's decision made no mention of MHP having participated in any DEC proceedings with regard to plaintiff's SPDES permit.

While the modification proceeding continued, the DEC brought another action against plaintiff for violating its SPDES permit. As with the earlier action, plaintiff claims that this action by DEC was baseless. The complaint states that in March 1997, the DEC filed a $14.5 million enforcement action against plaintiff for violating its SPDES permit, "despite the knowledge of its personnel that [plaintiff] ha[d] accurately monitored discharges in accordance with the requirements of its SPDES permit." (Complaint ¶ 109).

On March 26, 1997, in connection with the permit modification proceeding, the DEC issued an Interim Decision of the Deputy Commissioner. ( [# 19], Exhibit B) The decision noted, in relevant part, that the DEC appeared to have good cause for initiating the change to plaintiff's SPDES permit, since it appeared to "have evidence that giving rise to a concern that BPSI is discharging brine derived from expansion of caverns, in addition to water derived from routine ground water infiltration, thereby apparently exceeding the scope of the project as described in the application." With regard to plaintiff's objections to the "mass balance" formula, the Deputy Commissioner stated that "a mass balance analysis is hardly a 'theoretical' or 'unsubstantiated technique,' as BPSI argues. It is a standard approach." (Id.)

When plaintiff commenced this action, the DEC had not yet made a final determination as to the modification of plaintiff's SPDES permit. However, on August 28, 1998, the DEC issued a Decision of the Deputy Commissioner, which ruled that plaintiff's SPDES permit would be modified, and that the "mass balance" formula would be used to monitor plaintiff's compliance. ( [# 48], Exhibit A). That decision stated, in relevant part, that "[t]he facts fully justify requiring [plaintiff] to increase its reporting activity under the SPDES permit, which is what the reclassification accomplishes. Likewise, the mass balance formula modification is appropriate under the facts. It appears that the applicable water quality criteria for total dissolved solids and chlorides have been exceeded on at least a few occasions as a result of [plaintiff's] activities, and the proposed mass balance approach will aid in avoiding recurrences of water quality standards violations." (Id.)

In addition to the proceedings regarding plaintiff's SPDES permit, plaintiff also had an application pending before the DEC to modify its underground salt cavern storage permit. Plaintiff alleges that the DEC refused to act upon this application until such time as plaintiff provided sonar soundings for each existing well. Plaintiff claims that such sonar soundings are "prohibitively expensive." (Complaint ¶ 111). Plaintiff further contends that sonar soundings are not required under the existing regulations and that they have never been required in the past as a condition precedent to consideration of a permit application. Plaintiff alleges that in imposing this requirement, the DEC was again acting at the behest of "MHP or its affiliates." (Id., ¶ 112) The complaint acknowledges that the sonar requirement may have been suggested by the Interstate Oil and Gas Compact Commission ("IOGCC"), although plaintiff claims that this organization is "controlled" by TPC. (Complaint ¶ 113). However, plaintiff admits that DEC "invited input" from the IOGCC, and that the Director of DEC's Minerals Division, sits on the IOGCC's governing board. (Id.)

### c. The Proceeding Before the EPA

As part of the proposed project between plaintiff and CNGT, plaintiff intended to dispose of a portion of the salt-water brine produced by mining, by injecting it into underground wells. Accordingly, plaintiff applied for underground injection control permits from the U.S. Environmental Protection Agency (EPA). MHP, CREST, and the New York DEC opposed this application. The complaint alleges that on May 1, 1997, MHP filed comments with EPA opposing the application and requesting a public hearing. In opposing plaintiff's application, MHP allegedly stated that:

a. The draft permits disregarded evidence of underground faulting at the Bath site and other geological and engineering problems that could cause migration of fluids or natural gas from the well bores, cavern or disposal zones into overlying formations and Underground Sources of Drinking Water ("USDWs"); b. BPSI storage caverns do not conform to U.S. Government endorsed design and construction specifications propounded by the IOGCC; c. Because of the proximity of the proposed wells to existing drinking water wells and USDWs, any evidence of geological problems or safety or design problems with the wells are cause for serious concern; d. Neither FERC nor NYDEC is satisfied with BPSI's geological stability or well design data; e. Because disposal of significant quantities of waste brine in underground formations in the Western New York portion of the Appalachian Basin at the pressure limitations imposed in the Class IID draft permits has been demonstrated to be infeasible, there is no basis for issuing final permits; f. The monitoring requirements in the draft Class IID permit are inade-

quate; g. BPSI's Class III draft permit is predicated upon apparent misinformation regarding the intended purpose of the wells; and h. EPA's proposal to regulate BPSI's brine disposal in Class IID wells is unlawful because it treats BPSI differently than similarly situated parties.[6]

(Complaint ¶ 115). Plaintiff states that these statements by MHP were false, because:

a. There is no evidence of faulting or widespread evidence of cavern ceiling collapses at the Bath Storage Facility; b. The stated IOGCC guidelines relating to domal salt cavern construction have no applicability to stratified salt formations; c. MHP's claim that the geology of the region precludes BPSI from demonstrating an ability to dispose of brine into deep injection wells at the proposed disposal rates, is erroneous and not based upon any scientific data applicable to the Bath Storage Facility site; and d. MHP's attempt to distinguish between "low pressure" storage of LPG and natural gas are and will be stored in the salt caverns at the same pressure.

(Complaint ¶ 118). On April 28, 1997, CREST also filed comments with the EPA, that essentially mirror the comments CREST made to the DEC. (Complaint ¶ 120) In May of 1997, the New York DEC also filed comments in opposition to plaintiff's application. The complaint does not allege that EPA was defrauded by any of these statements, or that EPA did anything as a result of these statements by MHP and CREST.[7]

On August 25, 1998, after this action was commenced, the EPA issued a final permit decision, granting plaintiff's application. The decision concluded, *inter alia*, that

---

**6.** The "similarly situated" party is MHP, which had been issued a more restrictive permit for its Tioga project.

**7.** In Count VII of the complaint dealing with the claim for common law fraud, the complaint makes a conclusory assertion that "NY-

DEC, FERC and the EPA relied upon those representations and as a result, took actions which damaged BPSI" (Comp par 191), however the complaint does not allege what those "actions" were or how they injured plaintiff.

there was no geologic faulting at the site which would affect the safety of the project. The EPA decision stated, in relevant part:

> Geophysical data submitted to EPA regarding potential of faulting in the area of the Bath project does not substantiate the existence of faults that would serve as conduits of fluids from the Class IID injection zones to the USDWs. After examining the geophysical data provided by MHP, EPA concluded that there is no evidence of faulting of the confining layers above the Class IID injection zone. The most likely cause of the MHP described "thrust vault" within the central portion of the seismic line ... is due to processing error of the weathering zone; this portion of the seismic line coincides with thick unconsolidated low velocity Pleistocene deposits. ... If a fault does exist in the salt section, the fault is most likely a sealed fault; salt is plastic and self healing. If a fault exists within the salt section, it may not compromise the confining properties of this section.

( [# 48], Exhibit B)

### d. The Avoca Project and the NYSEG Seneca Lake Project

In addition to the foregoing, and in an attempt to show a pattern of racketeering activity by defendants, plaintiff claims that defendants also defrauded other administrative agencies which were considering applications from two of defendants' competitors who are not parties to this action. The first of these was the Avoca Project, and the second was the New York State Electric & Gas Corporation's ("NYSEG") Seneca Lake Project. Plaintiff claims that in February 1995, while TPC and MHP were working on their Tioga Storage Facility, they formed a sham environmental corporation called Concerned Citizens of the Cohocton Valley ("CCCV"), for the purpose of promoting the Tioga project and attacking any competitors' projects. Shortly thereafter, one such competitor, Avoca Natural Gas ("Avoca"), began work on a competing gas storage facility near defendants' Tioga facility. Avoca filed an application with FERC for a certificate to develop, construct and operate an underground gas storage field in Avoca, New York. Plaintiff alleges that in April of 1996, MHP sought leave to intervene in the proceeding, and filed materially misleading comments, however, the complaint does not identify these alleged comments. In April of 1997, CCCV also moved to intervene in Avoca's proceeding before FERC, and allegedly filed false and misleading statements as well. However, these allegedly false statements by CCCV pertained not to the Avoca project itself, but to plaintiff's project in Bath. CCCV essentially urged FERC, when considering Avoca's application, to also consider the effects that the Bath project would have on the environment. CCCV urged FERC to consider the cumulative effects that the two projects would have, rather than considering Avoca's application in isolation. (Complaint, ¶ 65(g)) CCCV allegedly told FERC that the Bath project could not discharge brine from solution mining into the Cohocton River under its then-existing SPDES permit, and that because of environmental damage that had already occurred, it was unlikely that plaintiff would be allowed to discharge brine from solution mining into the river. CCCV also allegedly told FERC that the DEC had ordered plaintiff to halt its solutioning activities, and was seeking fines from plaintiff for violating its SPDES permit. The complaint states that CCCV's efforts were "successful," because one month after CCCV filed its comments with FERC, Avoca abandoned the project and went bankrupt. The complaint does not specifically allege that FERC was defrauded, or that the alleged misstatements by CCCV caused Avoca to abandon its project. It also does not allege that these statements by CCCV or MHP caused a delay in the FERC proceeding, or that FERC did anything as a result of the alleged misstatements. Another of defendants' competitors, NYSEG, had an appli-

cation pending before FERC with regard to a project known as the Seneca Lake Storage Project. Plaintiff contends that on February 7, 1997, MHP intervened in the proceeding before FERC, and stated that NYSEG would need FERC approval for a particular aspect of its project. The complaint states that FERC disagreed with MHP, but it does not state that FERC was defrauded or that NYSEG was injured as a result. (Complaint, ¶¶ 129–31).

### e. The Subject Action

Plaintiff commenced this action on March 31, 1998, by way of the subject complaint, which sets forth seven causes of action. For the first and second causes of action, plaintiff claims that all defendants have violated the Racketeer Influenced and Corrupt Organizations (RICO) statute, 18 U.S.C. § 1961 et seq. The complaint alleges that all defendants are "part of an associated in fact enterprise . . ., within the meaning of 18 U.S.C. § 1961(4)." (Complaint [# 1], ¶ 6), and that they have each violated the RICO statute in two respects. First, plaintiff claims that each defendant has "conducted or participated, and continues to conduct or participate, directly or indirectly, in the conduct of such Enterprise's affairs through a pattern of racketeering activity, in violation of 18 U.S.C. § 1962(c)." (Complaint [# 1], ¶ 6). Second, plaintiff contends that each defendant has "conspired to violate 18 U.S.C. § 1962(c), by agreeing to participate in the affairs of such Enterprise through the commission of, or through aiding and abetting the commission of, a pattern of racketeering activity involving numerous acts of mail and wire fraud." (Id.) In support of these contentions, the complaint states, that from the actions of MHP, CREST,

and TPC, "an agreement to commit those acts [mail and wire fraud] can be fairly implied." (Complaint [# 1], ¶¶ 125–27). Plaintiff alleges that while the defendants appear to be separate entities, they are in fact all associated with and are part of TPC.[8] In this regard, the plaintiff claims that TPC controls the board of directors and officers of Market Hub Partners, Inc., which operates as TPC's alter-ego. Plaintiff contends that defendants want to eliminate any competing underground gas storage facilities, so that its facility in Tioga Pennsylvania will be the only such facility in interstate commerce in the northeastern United States. Plaintiff alleges that defendants' activities constitute a pattern which will likely continue. As evidence of this, plaintiff points to the Avoca Project and the Seneca Lake Storage Project, and contends that defendants have used the same unlawful tactics against these other competitors. Plaintiff alleges that even though its lease with CNGT has been terminated, that it still owns a gas storage facility and that it likely that the defendants will continue to engage in fraudulent campaigns against BPSI in its efforts to compete with MHP in the gas storage business.

As for the third cause of action, plaintiff alleges that MHP and TPC violated § 2 of the Sherman Act, 15 U.S.C. § 2, in that through the use of these fraudulent activities before FERC, DEC, and EPA, they have attempted to monopolize underground storage of high deliverability of natural gas in the northeastern United States. The plaintiff alleges that the activities of MHP and TPC were in bad faith and were nothing more than an attempt to interfere with the business of a competitor.

**8.** TPC is a Delaware corporation with its principal place of business in Houston, Texas, and it is the largest owner of natural gas salt cavern storage facilities in the United States. In 1994, TPC performed a limited partnership called Market Hub Partners, LP. The limited partnership consists of five limited partners and one general partner. The five limited partners are: TCP, Nipsco Industries, Inc., New Jersey Resources, Corp., DPL, Inc., and Public Service Enterprise Group. The general partner is Market Hub Partners, Inc., whose stock is owned by the aforementioned five limited partners of Market Hub Partners, LP.

As for the fourth cause of action, plaintiff alleges that MHP and TPC violated § 340 of the New York's General Business Law as a result of their attempts to monopolize the underground storage of high deliverability of natural gas in New York and to otherwise restrain the exercise of competition in violation of § 340 of New York's General Business Law. For the fifth cause of action, plaintiff also alleges that all defendants have violated § 349 of New York's General Business Law because they made statements to the administrative agencies that were false and deceptive and misleading in a material way and would tend to mislead a reasonable consumer. For the sixth cause of action, plaintiff alleges that all the defendants have tortiously interfered with its lease agreement with CNGT. Finally, plaintiff alleges that all of the defendants have engaged in common law fraud, in that they made materially false representations to the New York DEC, the FERC, and the EPA, which were known to be false when made, and that the New York DEC, the FERC, and the EPA relied upon those representations and as a result, took actions which damaged plaintiff. Plaintiff further alleges that the defendants acted maliciously, willfully, wantonly, and with reckless disregard for plaintiff's rights, and accordingly, plaintiff is seeking punitive damages. In addition to monetary damages, the plaintiff is seeking a permanent injunction enjoining the defendants from "continuing their fraudulent schemes directed against [plaintiff]."

Instead of answering the complaint, all defendants moved to dismiss. On May 22, 1998, MHP moved to dismiss the complaint pursuant to Fed.R.Civ.P. 12(b)(6) for failure to state a claim upon which relief can be granted [# 13]. The motion is based upon several grounds. First, MHP contends that plaintiff has failed to allege a direct, "but for" and proximate causal relationship between anything it did and plaintiff's alleged injuries. Rather, MHP contends that any injury suffered by plaintiff is a result of CNGT canceling its lease with plaintiff. MHP contends that plaintiff's injury, if any, was caused only by CNGT's cancellation of the lease agreement, and not because of any statements made by the defendants to the various regulatory agencies. Second, MHP contends that it is shielded from any liability by the First Amendment and the *Noerr–Pennington* doctrine. Third, MHP contends that plaintiff has failed to allege fraud with particularity, as required by Fed.R.Civ.P. 9(b). More specifically, MHP alleges that the complaint makes only conclusory allegations of fraud, and does not identify any specific fraudulent statements by defendants. Fourth, and in the alternative, MHP moves to have any claims that are not dismissed referred to either the FERC, the EPA, or the New York DEC. MHP alleges that since plaintiff's claims concern technical, geological, environmental, engineering and regulatory policy and fact issues that are within the primary jurisdiction of the FERC, the EPA, and the New York DEC, that this Court should abstain from determining those issues. On May 27, 1998, CREST moved to dismiss [# 19] pursuant to Fed. R.Civ.P. 12(b)(6), for essentially the same reasons as MHP, i.e., failure to adequately plead causation, failure to adequately plead fraud, *Noerr–Pennington* doctrine, and that these matters should be heard by the various regulatory agencies, who have more expertise in these areas. CREST claims that it never intervened in CNGT's application proceeding before the FERC, and that it never made any submissions to the FERC regarding CNGT's application. In addition, CREST claims that plaintiff's action is barred by Section 76–a of the New York Civil Rights Law, which states in relevant part that

> "in an action involving public petition and participation, damages may only be recovered if the plaintiff, in additional to all other necessary elements, shall have established by clear and convincing evidence that any communication which gives rise to the action was made with

knowledge of its falsity or with reckless disregard of whether it was false, where the truth or falsity of such communication is material to the cause of action at issue."

CREST argues that there is adequate support in the record for the opinions and statements which it made in regard to plaintiff and CNGT, and therefore, plaintiff cannot recover damages against it. CREST argues that plaintiff should be estopped from claiming that CREST is a "sham" organization, since the DEC ALJ has already ruled that CREST is not a sham. CREST further argues that since plaintiff never appealed that ruling by the ALJ, that it should be estopped from raising that claim in this action. CREST also argues that plaintiff has failed to exhaust its administrative remedies, because it did not appeal the ALJ's ruling. In addition, CREST argues that the plaintiff cannot proceed under New York's General Business Law § 349 because this is not a "consumer oriented transaction," and its actions were not directed to consumers. Finally, CREST argues that there has been no tortious interference with the plaintiff's contract by CREST, since there has been no showing of any communication from CREST to CNGT. On June 11, 1998, defendant TPC also moved to dismiss the complaint pursuant to Fed. R.Civ.P. 12(b)(1), 12(b)(6) and 9(b). TPC contends that the claims against it should be dismissed since it did not make any of the statements complained of, and none of the statements of MHP or CREST can be imputed to it. Moreover, TPC states that plaintiff has failed to state a claim with respect to each and every cause of action. The Court has thoroughly considered the parties' written submissions, as well as the oral arguments of counsel.

## ANALYSIS

It is well settled that in determining a motion under Fed.R.Civ.P. 12(b)(6), a district court must accept the allegations contained in the complaint as true and draw all reasonable inferences in favor of the nonmoving party. *Burnette v. Carothers*, 192 F.3d 52, 56 (1999). While the Court must accept as true plaintiff's factual allegations, "[c]onclusory allegations of the legal status of the defendants' acts need not be accepted as true for the purposes of ruling on a motion to dismiss." *Hirsch v. Arthur Andersen & Co.*, 72 F.3d 1085, 1092 (2d Cir.1995)(*citing In re American Express Co. Shareholder Litigation (Lewis v. Robinson)*, 39 F.3d 395, 400–01 n. 3 (2d Cir.1994)). The Court "may dismiss the complaint only if it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Id.* (internal quotations omitted)(*citing Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)).

### Noerr–Pennington Doctrine

■ The Noerr–Pennington doctrine provides that activities directed toward influencing governmental action, such as litigation and lobbying, are immunized from antitrust liability, unless such activities are shown to be a mere sham. *Professional Real Estate Investors v. Columbia Pictures Industries*, 508 U.S. 49, 56–57, 113 S.Ct. 1920, 123 L.Ed.2d 611 (1993). In creating the Noerr Pennington doctrine, the United States Supreme Court recognized that such litigation and lobbying would at times involve disputes between business competitors:

> We conclude that it would be destructive of rights of association and of petition to hold that groups with common interests may not, without violating the antitrust laws, use the channels and procedures of state and federal agencies and courts to advocate their causes and points of view respecting resolution of their business and economic interests vis-a-vis their competitors.

*California Motor Transport Co. v. Trucking Unlimited*, 404 U.S. 508, 510–511, 92 S.Ct. 609, 30 L.Ed.2d 642 (1972). The sham exception to the Noerr Pennington doctrine provides that "activity ostensibly

directed toward influencing governmental action does not qualify for Noerr immunity if it is a mere sham to cover an attempt to interfere directly with the business relationships of a competitor." *Professional Real Estate Investors*, 508 U.S. at 51, 113 S.Ct. 1920 (internal quotations omitted). Essentially, a defendant's activities are a sham where they are frivolous and instituted solely for the purpose of injuring, harassing or delaying the opponent. In *Professional Real Estate Investors* ("PRE"), the Supreme Court established a two-pronged test for establishing the sham exception to the *Noerr–Pennington* doctrine: a party must demonstrate 1) that the activities were "objectively baseless in the sense that no reasonable litigant could realistically expect success on the merits" and 2) that the baseless activity conceals "an attempt to interfere directly with the business relationships of a competitor, through the use of the governmental process—as opposed to the outcome of that process—as an anticompetitive weapon." *Professional Real Estate*, 508 U.S. at 60–61, 113 S.Ct. 1920. A finding that a defendant had probable cause to institute legal proceedings ends the inquiry, regardless of defendant's subjective intent. *Id.* at 62, 113 S.Ct. 1920. Where there is no dispute over the predicate facts of the underlying legal proceeding, the court may decide probable cause as a matter of law. *Id.* at 63, 113 S.Ct. 1920. The Supreme Court noted that "[a] winning lawsuit is by definition a reasonable effort at petitioning for redress and therefore not a sham." *Id.* at 508 U.S. 61, n. 5, 113 S.Ct. 1920. Recognizing that judgments obtained by fraud can be set aside, the Court also stated that it was declining to decide "whether and, if so, to what extent Noerr permits the imposition of ... liability for a litigant's fraud or other misrepresentations." *Id.* at p. 61, n. 6, 113 S.Ct. 1920. Other courts have held that a party's misrepresentations to a court can constitute a sham, for purposes of Noerr Pennington, where "a party's knowing fraud upon, or its intentional misrepresentations to, the court deprive the

litigation of its legitimacy." *Kottle v. Northwest Kidney Centers*, 146 F.3d 1056, 1060 (9th Cir.1998), *cert. denied*, 525 U.S. 1140, 119 S.Ct. 1031, 143 L.Ed.2d 40 (1999). However, a plaintiff should not be allowed to invoke the sham exception in this manner by "simply recast[ing] disputed issues from the underlying litigation as 'misrepresentations' by the other party." *Oregon Natural Resources Council v. Mohla*, 944 F.2d 531, 536 (9th Cir.1991). Where a party has in fact made misrepresentations, to invoke the sham exception they must be material misrepresentations. *See, Cheminor Drugs, Ltd. v. Ethyl Corp.*, 168 F.3d 119, 124 (3rd Cir.1999), *cert denied* 528 U.S. 871, 120 S.Ct. 173, 145 L.Ed.2d 146 (1999). Where, as here, the plaintiff claims that defendant's actions were a sham because defendants made misrepresentations, the Court should examine

> the outcome of the proceedings, including findings made by the relevant administrative tribunals, the nature of the particular allegations of the petition or actions before the administrative agency claimed to be fraudulent or improper, and whether these claimed misrepresentations or improper actions would have been significant to the ultimate outcome or continuation of the proceeding.

*Music Center S.N.C. Di Luciano Pisoni & C. v. Prestini Musical Instruments Corp.*, 874 F.Supp. 543, 549 (E.D.N.Y.1995); *Cheminor Drugs, Ltd.*, 168 F.3d at 123–24. The Noerr–Pennington doctrine is applicable in antitrust actions and RICO actions. *See, International Brotherhood of Teamsters, Local 734 Health and Welfare Trust Fund v. Philip Morris Inc.*, 196 F.3d 818, 826 (7th Cir.1999)("Although the Noerr–Pennington doctrine originated in antitrust law, its rationale is equally applicable to RICO suits.") There is no "government conspiracy" exception to Noerr Pennington. *City of Columbia v. Omni Outdoor Advertising, Inc.*, 499 U.S. 365, 383, 111 S.Ct. 1344, 113 L.Ed.2d 382 (1991)(rejecting the idea of a " 'conspiracy' exception,

which would apply when government officials conspire with a private party to employ government action as a means of stifling competition.")

Plaintiff claims that the Court should not consider a motion to dismiss based upon Noerr Pennington until after plaintiff has completed discovery. (Plaintiff's Memorandum of Law [# 33], p. 14). However, the Court disagrees. As was held in *Music Center S.N.C.*, 874 F.Supp. at 549,

[a] rule permitting discovery, based solely on allegations of misrepresentation in a petition, would fail to recognize that an inaccurate petition, even one containing deliberate misstatements, might nonetheless not be so lacking in merit as to be objectively baseless.

\*   \*   \*   \*   \*   \*

To allow antitrust claims based solely on broad and indistinct allegations of misrepresentation and 'sham litigation' to reach discovery, regardless of the role the claimed misrepresentations played, or could have played, in the prior proceeding, would predicate the viability of an antitrust complaint on a petitioner's subjective intent, and not the objective merit of its petition, and thus directly contravene the Supreme Court's holding in PRE. Moreover, such discovery would have the effect of encouraging antitrust 'strike suits,' and effectively chill the First Amendment rights which Noerr immunity was intended to protect.

(citations omitted). As noted above, in addition to considering plaintiff's complaint, the Court may also consider the various documents from the underlying administrative proceedings, since plaintiff had notice of these proceedings and bases its action upon those proceedings. *See, Brass v. American Film Technologies, Inc.*, 987 F.2d 142, 150 (2d Cir.1993)[9]. Thus, in ruling upon defendants' motions, the Court here need not rely solely upon

plaintiff's characterizations of the proceedings before FERC, DEC, and EPA, but rather, the Court can and does conduct its own examination of those proceedings.

### The FERC Proceeding

■ The Court finds that defendants' actions before FERC were not objectively baseless. First, the Court notes that MHP did not initiate the proceeding before FERC, but rather, MHP responded to a public notice issued by FERC, which invited any person desiring to be heard to file comments or protests. Then, even before MHP filed comments, the New York DEC sent a letter to FERC raising numerous concerns with CNGT's application, including concerns over the potential environmental impact of the project. Moreover, DEC noted that it intended to require plaintiff to obtain a new SPDES permit. Thus, while plaintiff blames MHP for raising fraudulent environmental concerns, the fact is that the New York DEC brought these issues to FERC's attention before MHP filed any papers with FERC. With regard to MHP's first objection, filed on August 15, 1996, most of the objection centered around MHP's request that FERC issue a cease and desist order against plaintiff's unlawful solution mining. Plaintiff's complaint does not mention this fact, nor does it claim that MHP's objection was baseless. This is understandable, since FERC agreed with MHP and determined that plaintiff could not continue to develop its salt caverns without FERC's approval. Clearly, this portion of MHP's objection was not objectively baseless. Part of that objection did express concern over the safety of plaintiff's project, based upon the fact that plaintiff had experienced a fire and tubing failures at its site. However, it appears undisputed that plaintiff did experience problems with its number 2 and 2a wells, and did have

---

9. Although plaintiff objects to the Court considering these documents on a 12(b)(6) motion, it does not attempt to distinguish *Cortec Industries, Inc. v. Sum Holding L.P.* 949 F.2d 42 (2d Cir.1991) or *Brass v. American Film Technologies, Inc.*, 987 F.2d 142, 150 (2d Cir. 1993).

an explosion and fire.[10] Accordingly, MHP's first objection filed with FERC was not baseless. MHP's second objection, filed on August 28, 1996, dealt exclusively with the rates that CNGT had proposed to charge its customers. Again, plaintiff does not claim that this objection was baseless. On December 26, 1996, MHP filed a third objection. Half of that objection again addressed the project's proposed cost and the rates to be charged by CNGT. Plaintiff does not object to those assertions, nor does it claim that they were baseless. However, the other half of that objection claimed that MHP had evidence of a geological fault at plaintiff's site. To support this claim, MHP submitted affidavits and test results from geologists. In response, CNGT denied that there was a geological fault at the site, and it provided affidavits and studies from its own geologists to support that claim. (See, Letter from CNGT to FERC, Declaration of John Quinn [# 16], Exhibits 16–17) MHP also expressed concerns over the stability and suitability of the site for use in storing natural gas. MHP raised concerns over possible environmental damage from solution mining, and expressed the view that plaintiff had violated its SPDES permit on various occasions. Plaintiff claims that these objections was baseless and fraudulent. However, the record supports at least some of these claims. For example, plaintiff does not deny that its cavern design deviated from the IOGCC's design standards, as MHP claimed, nor does it deny that there was at least some possibility of a catastrophic explosion at its site. Moreover, as noted above, it does appear that plaintiff had a fire at its site, as well as problems with two of its wells. Moreover, even if MHP's claims were not true, there is no indication that those statements had any effect on the duration or outcome of the FERC proceeding. Rather, it is clear that FERC dismissed CNGT's application, without prejudice, because CNGT had failed to provide information which FERC had repeatedly requested. When it dismissed CNGT's application, FERC did not state that its action was in any way related to anything that MHP had done, nor did it indicate that its dismissal was related to any concerns that MHP had raised. As for defendant CREST, while plaintiff claims that CREST intervened in the FERC proceeding, there is nothing in the record to support that claim, and plaintiff has not identified any statements that CREST allegedly made to FERC. Based upon the fact that many of defendant's objections are not being challenged here by plaintiff, and that there was a factual basis for many of defendants' claims, the Court finds that defendant's had probable cause for their objections. Accordingly, the Court finds that plaintiff cannot demonstrate that defendants' actions before FERC were objectively baseless.

The DEC Proceeding

■ The Court also finds that defendants' activities in the DEC proceedings were not objectively baseless. As with the FERC proceeding, the DEC proceeding was not initiated by any of the defendants. Rather, the DEC itself initiated the modification of plaintiff's SPDES permit. Plaintiff alleges that the DEC "relied on the factual representations made by CREST and embarked on a proceeding that threatens [plaintiff's] existing LPG storage business" (Complaint [# 1], ¶ 101). However, CREST did not even exist at the time the DEC initiated the modification proceeding. According to the complaint, the DEC initiated the permit modification and proposed the mass balance formula in November of 1996. CREST was not formed until January of 1997. (Complaint

10. The Court notes that Hon. Thomas W. Keegan, Justice of the Supreme Court, Albany County, in a Decision and Order dated January 29, 1997, in an Article 78 proceeding initiated by plaintiff, referred to the fact that plaintiff itself had stated that it had "problems with tubing failures at Well No. 2," and had applied to the DEC for a permit to drill a replacement well.

[# 1], ¶¶ 90,92). Moreover, the ALJ determined that DEC initiated the modification proceeding, not because of defendants, but because it had learned that plaintiff had applied to the Susquehanna River Basin Commission for permission to pump ground water for use in solution mining. Obviously, that would have created a concern on the DEC's part that plaintiff was engaging in activities that would increase its discharge of salt water brine. Moreover, the ALJ specifically rejected plaintiff's claim that CREST was a sham organization. Once CREST was allowed to intervene in the proceeding, the ALJ ruled that CREST could only raise issues relating to the SPDES permit. Therefore, most of the statements in CREST's papers were not even considered by the ALJ. For example, the claims relating to rattlesnake habitat, geologic faulting, and unstable mines were not considered by the ALJ, and consequently those claims could hot have affected the outcome of the proceeding. Ultimately, DEC did modify plaintiff's permit, finding that the mass balance formula was appropriate. The DEC rejected plaintiff's claim that the "mass balance" formula was a novel idea suggested by defendants. Rather, the DEC stated that the "mass balance" formula was "a standard approach." Moreover, the DEC determined that plaintiff had violated its SPDES permit "on at least a few occasions." ( [# 48], Exhibit A). Accordingly, there is nothing to indicate that defendants' statements in the SPDES modification proceeding were objectively baseless.

With regard to plaintiff's separate application to modify its underground salt cavern storage permit, there is also no indication that defendants raised any objectively baseless claims. Plaintiff claims only that MHP suggested to DEC that it require plaintiff to conduct sonar testing of its wells. However, even if that were true, that does not get around the Noerr Pennington doctrine. As noted above, there is no government conspiracy exception to Noerr Pennington. *See, City of Columbia v. Omni Outdoor Advertising, Inc.*, 499

U.S. at 383, 111 S.Ct. 1344. Therefore, while plaintiff makes numerous allegations that defendants and DEC acted together to hinder plaintiff, plaintiff cannot demonstrate that defendants' actions were a sham.

*The EPA Proceeding*

■ The Court similarly finds that defendants' actions before the EPA were not objectively baseless. After plaintiff applied to the EPA for underground injection control permits, MHP and CREST filed comments with EPA. The DEC also filed comments. MHP and CREST's submissions raised the same structural and environmental concerns that they had raised before the FERC and the DEC. According to the EPA's report, comments were also received from numerous individuals and organizations other than MHP and CREST. After considering all of the comments it received, the EPA granted plaintiff's application. With regard to the concerns defendants expressed over possible pollution of drinking water, the EPA stated that its permits were designed to protect drinking water supplies. However, the EPA did not state that this concern was frivolous or baseless. While the EPA also found that plaintiff's well design and geologic stability were satisfactory, it did not state that defendants' objections were baseless. Moreover, while the EPA found that there was no "hard evidence" of geologic faulting, it did not state that MHP and CREST's comments in that regard were baseless or frivolous. Rather, the EPA stated that defendants' evidence of a geologic fault may have been caused by a "processing error," which may have created the appearance of faulting. ( [# 48], Exhibit B) Therefore, while defendants did not "prevail" in the EPA proceeding, there is no indication that defendants' opposition to the issuance of the permit was objectively baseless. *See, generally, Envirosource, Inc. v. Horsehead Resource Dev. Co., Inc.*, No. 95 CIV. 5106(AGS) 1996 WL 363091 (S.D.N.Y. July 1, 1996); *Mover's & Warehousemen's Assoc. of Greater New*

*York v. Long Island Moving & Storage Ass'n, Inc.,* No. 98 CV 5373(SJ) 1999 WL 1243054 at *6 (E.D.N.Y. Dec.16, 1999); *Omega Homes, Inc. v. City of Buffalo,* 4 F.Supp.2d 187, *aff'd,* 171 F.3d 755 (2d Cir. 1999), *cert denied* 528 U.S. 874, 120 S.Ct. 179, 145 L.Ed.2d 151 (1999).

Based upon all of the foregoing, the Court finds that defendants are entitled to Noerr Pennington immunity for any claims arising out of their activities in the administrative proceedings before FERC, DEC, and EPA. Furthermore, since all of plaintiff's claims in this action are based upon the statements that defendants made to those agencies, those claims are all barred by the Noerr Pennington doctrine. Accordingly, the Court finds that the complaint should be dismissed in its entirety pursuant to Fed.R.Civ.P. 12(b)(6).

Failure to State a Claim

■ Although the Court has determined that the complaint must be dismissed pursuant to the Noerr Pennington doctrine, the Court also notes that even if plaintiff's claims were not barred by Noerr Pennington, plaintiff has failed to state a claim, since it has failed to plead any facts demonstrating that defendants' statements caused injury. There is a causation element for claims under both RICO and the Sherman Act. The United States Supreme Court in *Holmes v. Securities Investor Protection Corp.,* 503 U.S. 258, 268, 112 S.Ct. 1311, 117 L.Ed.2d 532 (1992), held that a claims under RICO, 28 U.S.C. § 1964, require a showing of both "but for" causation and proximate causation. The Court in *Holmes* noted that proximate causation requires that there be "some direct relation between the injury asserted and the injurious conduct alleged." *Id.* With statutory claims, such as claims under RICO and the Sherman Act, the issue is whether or not a plaintiff is in the category of persons which the statute seeks to protect, and whether or not the harm that occurred was the "mischief" the statute seeks to avoid. *Abrahams v. Young &*

*Rubicam, Inc.,* 79 F.3d 234, 237 (2d Cir. 1996). The Second Circuit has held that

> [c]entral to the notion of proximate cause is the idea that a person is not liable to all those who may have been injured by his conduct, but only to those with respect to whom his acts were a substantial factor in the sequence of responsible causation, and whose injury was reasonably foreseeable or anticipated as a natural consequence.

*First Nationwide Bank v. Gelt Funding Corp.,* 27 F.3d 763, 769 (2d Cir.1994), *cert denied* 513 U.S. 1079, 115 S.Ct. 728, 130 L.Ed.2d 632 (1995). Claims under New York's antitrust statute, General Business Law § 340, also require proximate causation, *Van Dussen–Storto Motor Inn, Inc. v. Rochester Telephone Corp.,* 63 A.D.2d 244, 252, 407 N.Y.S.2d 287 (4th Dept.1978)("Plaintiff must allege a causal link to its injury which is direct rather than incidental or remote"), as do claims under New York General Business Law § 349. *Moses v. Citicorp Mortgage, Inc.,* 982 F.Supp. 897, 903 (E.D.N.Y.1997)(Plaintiff must show that its injury was caused by defendant's deceptive acts). Plaintiff's claims for tortious interference with contract and fraud also require a showing of proximate causation. *Jabbour v. Albany Medical Center,* 237 A.D.2d 787, 790, 654 N.Y.S.2d 862 (3d Dept.1997); *Cofacredit, S.A. v. Windsor Plumbing Supply Co., Inc.,* 187 F.3d 229, 239 (2d Cir.1999). Here, the Court finds that defendants' actions were not the proximate cause of plaintiff's injury.

As noted above, plaintiff claims that it was injured when CNGT breached its agreement with plaintiff. Plaintiff attempts to demonstrate causation by stating, in relevant part, that "[i]n November of 1997 CNGT informed [plaintiff] that as a direct result of MHP's and CREST's actions to thwart regulatory approval, it had determined to terminate the Lease Agreement." (Complaint [# 1], ¶ 86) However, apart from this conclusory statement, the complaint fails to demonstrate how

defendants had any effect on the administrative proceedings, or how the administrative proceedings had any effect on CNGT's decision to breach its agreement with plaintiff. It is important to note that CNGT breached its agreement long before the DEC and EPA proceedings were ever completed. Therefore, there cannot be a causal connection between the outcome of those proceedings and CNGT's breach of the agreement. Nor has plaintiff pleaded any facts showing how anything that defendants said caused a delay in those proceedings, or otherwise contributed to CNGT's decision to breach the contract with plaintiff. The complaint states that CNGT amended its FERC application because it was concerned that it would not gain approval of its entire application in time for the coming winter heating season. (Complaint [# 1], ¶ 85) However, the complaint does not state facts demonstrating any connection between MHP's objections and CNGT's amendment. Rather, the complaint states in conclusory fashion that "it was clear that MHP and the other Defendants had been successful in delaying consideration [of CNGT's application]." (Id.) Plaintiff offers a hearsay statement by CNGT that "[d]efendant's objections to the BPSI project was slowing FERC's approval of the overall expansion" (Id. ¶ 88), however, the complaint does not allege any specific instance where defendants caused a delay. The complaint simply does not describe any action taken by FERC in response to defendant's objections. With regard to the DEC proceeding, the complaint likewise fails to allege a causal relationship between defendants and the actions of the DEC. Plaintiff admits that DEC initiated the permit modification, and that plaintiff itself initiated the proceeding to contest the modification. While plaintiff claims that CREST intervened in that proceeding for the purpose of delaying the proceeding, the complaint does not allege any facts showing that CREST had any effect on the proceeding or its outcome. The same is true of the EPA proceeding. For example, plaintiff claims that in the EPA proceeding, "virtually every objection to the issuance of the EPA permits was rejected out of hand by the EPA." (Plaintiff's Opposition to Supplemental Decisions [# 51], p. 2) However, if those claims were in fact "rejected out of hand," they obviously could not have caused any significant delay in the EPA proceeding.

There were also numerous independent intervening causes which may have caused a delay in the proceedings. For example, the DEC intervened in the FERC proceeding and raised numerous concerns before defendants became involved. Moreover, many other individuals and groups besides defendants raised objections before the various administrative agencies. However, one intervening cause in particular stands out. The Court notes, based upon its review of the documents from the FERC proceeding, that it appears clear that much of any delay in the FERC proceeding was due to a miscalculation by plaintiff and CNGT. Specifically, plaintiff and CNGT believed that plaintiff could begin work on the cavern mining without first obtaining approval from FERC. (See, Complaint [# 1], ¶ 34, Exhibit 1, ¶ 6; letters from FERC to CNGT, Declaration of John P. Quinn [# 16], Exhibits 5, 6) However, as noted above, MHP sought a cease and desist order, and FERC agreed that plaintiff needed FERC's approval before proceeding with the mining. (Id., Exhibit 5) This ruling by FERC presumably threw a monkey wrench into the project between plaintiff and CNGT, since it meant that they would have to go through the entire process of obtaining regulatory approval for an aspect of their project that they had believed did not require a permit. Moreover, after receiving this ruling, plaintiff did not immediately apply for a permit, but instead, it sought a hearing of FERC's determination. As a result, FERC considered CNGT's application to be incomplete. This objection by MHP is the only statement by a defendant that has been shown to have caused any delay in the FERC proceeding. However, plaintiff does not

claim that MHP's statements regarding this jurisdictional issue were fraudulent. Instead, plaintiff ignores this objection and focuses its attack on other statements by the defendant which cannot be shown to have had any effect on the proceedings. Based upon all of the foregoing, the Court finds that the complaint fails to properly plead proximate causation.

CONCLUSION

Accordingly, for all of the foregoing reasons, defendants' motions to dismiss the complaint are granted. The complaint is dismissed, with prejudice.

SO ORDERED.